UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CINDY BARAD ELIAS,

                              Plaintiff,

      – against –

GETTRY MARCUS CPA, P.C. and MARC
HEPPEN, CPA,

                             Defendants.

**OPINION AND ORDER**

17 Civ. 4066 (ER)

Ramos, D.J.:

      Cindy Barad Elias brings this action against her former accounting firm Gettry Marcus CPA, P.C. ("Gettry") and Marc Heppen, CPA ("Heppen"), a Gettry accountant, (collectively, "Defendants"), claiming malpractice, conflict of interest, breach of fiduciary duty, breach of contract, gross negligence, and tortious interference with a valid prenuptial agreement. *See* Complaint ("Compl."), Doc. 1. Elias alleges that the Defendants conspired against her during her divorce proceedings by encouraging her former husband to act in violation of their prenuptial agreement and by improperly revealing her confidential financial information to him. *Id.* Before the Court is Defendants' motion to dismiss the Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6). Doc. 28. For the reasons set forth below, Defendants' motion to dismiss is in GRANTED in part and DENIED in part.

## I. FACTUAL BACKGROUND[1]

In 2000, Elias hired Heppen as her personal accountant and financial advisor. Compl. ¶ 10. Heppen's work for Elias involved preparing her tax returns and any other financial documents she required and also advising her regarding all financial and tax matters. *Id.* ¶¶ 4, 10, 47. Elias placed great trust in Heppen as her financial adviser and accountant, and relied on him to handle virtually all of her financial affairs without her direct involvement. *Id.* ¶ 48. In early 2002, Heppen worked with Elias and her lawyer to negotiate and draft a prenuptial agreement in contemplation of Plaintiff's marriage to her (now) former husband ("Mr. Elias"). *Id.* ¶ 10. Because of this work, Heppen received in confidence private information and documents detailing Plaintiff's assets as well has her family's extensive real estate holdings and other substantial assets she stood to inherit. *Id.* ¶¶ 10, 27. This confidential information was provided by Elias herself and other sources personally related to her, including members of her family and her family lawyer. *Id.* ¶ 26. After Plaintiff got married, she relied on Mr. Elias and Heppen to collaborate in the oversight and management of her financial affairs—fully expecting Heppen to safeguard her personal interests in accordance with the prenuptial agreement. *Id.* ¶ 11.

Elias alleges that during the years that Heppen performed accounting and tax work for the then-married couple, he repeatedly and purposefully overstated Mr. Elias' income in several financial documents. *Id.* ¶ 14. Elias alleges this was to her detriment and entirely without her knowledge. *Id.* Specifically, Plaintiff claims that as early as October 2006, Heppen prepared personal financial statements for the couple that falsely attributed a six-figure salary to Mr. Elias

---

[1] The following facts are based on the allegations in the Complaint, which the Court accepts as true for purposes of the instant motion. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

based on his purported management of Plaintiff's real estate holdings, despite not actually being involved in their management. *Id.* ¶ 15. This supposed six-figure salary was never reflected on the couple's joint income tax returns, which Heppen also prepared. *Id.*

Elias alleges that immediately after she initiated divorce proceedings against her former spouse on June 13, 2013, Mr. Elias engaged Defendants to represent him in the divorce. *Id.* ¶ 18. Elias claims that the Defendants failed to disclose this engagement to her and also failed to ask her for a conflicts wavier, in breach of their fiduciary duties to her. *Id.* ¶¶ 18–19, 26. Heppen is alleged to have secretly advised Gettry's managing partner that they were going to represent Mr. Elias in a "messy divorce," but assured that, despite Mr. Elias not being the moneyed spouse, he "ha[d] the dollars to pay for it." *Id.* ¶ 19.

In July 2013, Mr. Elias received Heppen's assistance in drafting an affidavit that he planned to file in the divorce proceedings. *Id.* ¶ 21. Plaintiff alleges that Heppen advised Mr. Elias to "take dollars out" of specific bank accounts that contained a significant amount of Plaintiff's funds in order to, among other things, fund his defense in the divorce proceedings. *Id.* Plaintiff maintains that Mr. Elias, relying on Heppen's advice, wrongfully withdrew approximately $4.5 million of Plaintiff's money from her account. *Id.* ¶ 22. Plaintiff claims that Heppen knew or should have known that his advice was in violation of the terms of the prenuptial agreement that he had helped negotiate and draft. *Id.* Furthermore, Plaintiff claims that Defendants' inducement of Mr. Elias was motivated by Defendants' desire to ensure that Mr. Elias could pay Gettry for its work in connection with the divorce proceedings. *Id.* ¶ 62. Plaintiff further alleges that during the divorce proceedings, Heppen advised Mr. Elias to use the allegedly misleading financial statements (which Heppen had prepared) in which Mr. Elias was falsely portrayed as being involved in the management of Plaintiff's real estate holdings to assert

a supposed right to share in the appreciation of non-marital assets in an attempt to undermine the terms of the prenuptial agreement. *Id.* ¶¶ 16, 30.

Plaintiff further alleges that Heppen improperly disclosed her confidential information to Mr. Elias so that he could use that information to his advantage in the divorce proceedings. *Id.* ¶¶ 24, 28. It was only on August 9, 2013, after working with Mr. Elias in breach of their fiduciary duties to Plaintiff, that Defendants attempted to terminate their professional relationship with her. *Id.* ¶ 26. Defendants, however, never disclosed their work for Mr. Elias or that they had allegedly counseled Mr. Elias to withdraw approximately $4.5 million of Plaintiff's funds from her account in violation of the prenuptial agreement. *Id.* Beginning in February 2014, Defendants provided Mr. Elias with numerous documents from their files concerning their work for Plaintiff to advantage Mr. Elias in the divorce proceedings. *Id.* ¶ 29. Plaintiff contends that she only learned about Defendants' actions during the discovery phase of the divorce proceedings. *Id.* ¶ 31. She was allegedly required to incur substantial additional legal fees in an effort to counteract the effects of Defendant's prejudicial assistance to Mr. Elias during the divorce proceedings. *Id.* ¶¶ 17, 32.

On February 20, 2016, the parties entered a Marital Settlement Agreement (the "Settlement Agreement"), and a final judgment of dissolution was entered on March 1, 2016. *See* Doc. 25, Ex. 1. The instant action was commenced on May 31, 2017. Doc. 1.

## II. LEGAL STANDARD

### A. Rule 12(b)(6) Motion to Dismiss Standard

On a motion to dismiss pursuant to Rule 12(b)(6), the Court is required to accept as true all factual allegations in the complaint and to draw all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). However, the Court is not required to

credit legal conclusions, bare assertions or conclusory allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must contain enough factual matter to state a claim to relief that is plausible on its face. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Accordingly, a plaintiff is required to support its claims with sufficient factual allegations to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Iqbal*, 556 U.S. at 680 (quoting *Twombly*, 550 U.S. at 570).

### III. DISCUSSION

Elias alleges that Defendants, with whom she had previously had a longstanding professional relationship as her accountants and financial advisors, caused her substantial harm by actively assisting her former husband in their divorce proceedings. Specifically, Elias brings claims for professional malpractice and conflict of interest stemming from Defendants' failure to use reasonable care in their dealings with her. Compl. ¶¶ 33–44. She also brings claims for breach of fiduciary duty, breach of contract, gross negligence, and tortious interference with her valid prenuptial agreement, which Defendants helped draft. *Id.* ¶¶ 45–63. As a result of Defendants' actions, Plaintiff alleges that she suffered significant economic injuries, including the misappropriation of approximately $4.5 million of her personal assets, and substantial legal fees, costs and expenses incurred in order to protect her rights in the divorce proceedings. In response, Defendants contend that Plaintiff's claims arising out of her divorce proceedings are

barred by the General and Mutual Release Clause ("Release Clause") in Plaintiff's Settlement Agreement. Defs.' Mem., Doc. 29, at 4–19; Settlement Agreement, ¶ 22. Defendants also advance separate bases for dismissing certain of Plaintiff's other claims.[2]

### A. Whether Plaintiff's Claims are Barred by the Mutual Release Clause in the Settlement Agreement[3]

Defendants are not parties to the Settlement Agreement, have paid no consideration, undertook no obligations pursuant to its terms, and were not even aware of the Agreement's terms until almost a year after its execution. *See generally* Settlement Agreement; Doc. 8. Nonetheless, they seek to enforce the Settlement Agreement's Release Clause to bar Plaintiff's claims against them. Defs.' Mem. at 10. Under Florida law, only one who is an "intended third-party beneficiary" may enforce the terms of an agreement to which they are not a party. *See Pilot Constr. Servs. v. Babe's Plumbing, Inc.*, 111 So. 3d 955, 958 (Fla. 2d DCA 2013) (finding that non-party could not invoke terms of settlement agreement because the non-party "was not an intended third-party beneficiary of the release"). "'A non-party is the specifically intended beneficiary only if the contract clearly expresses an intent to primarily and directly benefit the third party or a class of persons to which that party belongs. To find the requisite intent, it must be established that the parties to the contract actually and expressly intended to benefit the third party . . . .'" *Berlinger v. Wells Fargo, N.A.*, No. 2:11-CV-459-FTM-29CM, 2014 WL 7073757, at *3 (M.D. Fla. Dec. 15, 2014) (quoting *Biscayne Inv. Grp., Ltd. v. Guar. Mgmt. Servs., Inc.*,

---

[2] Notably, as Plaintiff pointed out in her opposition papers and Defendants have not rebutted, Defendants do not seek dismissal of Plaintiff's tortious interference claim. Pl.'s Mem. at 23 n. 13; *see generally* Defs.' Reply, Doc. 37. Accordingly, the Court does not address the claim.

[3] The parties agree that pursuant to the terms of the Settlement Agreement, Florida law controls the interpretation of that contract. *See* Settlement Agreement ¶ 33(a).

903 So.2d 251, 254 (Fla. 3d DCA 2005)). An "incidental or consequential benefit" will not suffice. *Id.* (quotation marks and citation omitted).

Defendants claim that they are intended third-party beneficiaries because the Release Clause applies to claims brought against the agents of Plaintiff and Mr. Elias. Defs.' Mem. at 10–11 (asserting that "[P]laintiff released, waived, acquitted and forever discharged claims by [P]laintiff as against any agents of Mr. Elias and [P]laintiff"). The relevant portion of the Release Clause reads:

> In consideration of the sums received . . ., the undersigned Parties and Third Party Corporations . . . do hereby *release . . . each other . . .*, their . . . *agents*, attorneys and partners, *of . . . all claims* . . . suits, actions and causes of action of any kind and nature, known and unknown, in law or in equity, suspected or unsuspected, that they now have or have ever had *against each other*, arising on or prior to the date of this Release, including but not limited to those claims which were or could have been raised in [the divorce proceedings], and any and all claims arising out of or in any way connected with the parties' marriage or dissolution in any way whatsoever.

Doc. 25, Ex. 1 ¶ 22 (emphasis added). Defendants argue that they qualify as "agents" of Plaintiff and Mr. Elias since, they assert, they acted as their tax accountants "throughout the course of their marriage" and under Florida law "'accountants are always agents of their clients.'" Defs.' Mem. at 10–11 (quoting *Brooks Tropicals, Inc. v. Acosta*, 959 So.2d 288 (Fla. 3d Dist. Ct. App. 2007). In addition, Defendants point to the Agreement's Tax Liability Clause to bolster their claim that they are intended third-party beneficiaries who may invoke the Release Clause. *Id.* at 18; Doc. 25, Ex. 1 ¶ 15(c).

In contrast, Elias contends that Defendants' purported status as intended third-party beneficiaries is belied by the Settlement Agreement's text, structure, and the subsequent conduct of the parties to the Settlement Agreement. Pl.'s Mem., Doc. 35, at 13–16. Although each side offers an array of arguments with varying degrees of merit, the Court concludes that the text of

the Release Clause and subsequent conduct of the signatories to the Settlement Agreement does not evince a clear intention to release Defendants from liability in their capacity as Plaintiff's accountants.

The Court begins first with the Release Clause's text. The Release Clause provides that the "undersigned Parties and Third Party Corporations . . . do hereby *release . . . each other* both in their individual capacities and in their present or former capacities . . ., their . . . *agents* . . . of and from any and all claims . . . that they now have or have ever had *against each other* . . . ." Doc. 25, Ex. 1 ¶ 22 (emphasis added). The most natural reading of this language is that the parties intended to release each other and those individuals acting as the *counterparties*' agents, not that the parties intended to release claims against their own agents. Thus, even assuming, *arguendo*, that Defendants were agents under the terms of the release clause, there is no clearly expressed intent by Plaintiff to release her own agents. This distinction matters because Plaintiff has sued Defendants in their capacity as her former agents for breaching contractual and fiduciary obligations they owed to her, and Plaintiff's complaint makes clear that she does not bring claims against Defendants in their capacity as *Mr. Elias's agents*.

This reading is also consistent with the approach reflected in the general and mutual releases separately executed pursuant to paragraph 20 of the Marital Agreement. For example, in the general and mutual release between Plaintiff and Mr. Elias the parties specifically released each other and the counterparty's attorneys, but did not purport to release *their own* attorneys from any misconduct arising out of or related to the marriage and dissolution of marriage proceedings. *See* Doc. 36, Ex. A at 12–13. Because Plaintiff brings the instant action against Defendants in their capacity as *her* former agents, the fact that she may have waived claims against Defendants in their capacity as Mr. Elias's agents does not constitute a waiver of the

claims advanced here.

Second, as Elias notes, the Release Clause addresses "agents" only in the present tense, suggesting that the parties did not intend to release *former* agents. Although she concedes that Defendants were her agents "during the course of [her] intact marriage" she specifically alleges that Defendants terminated that agency relationship on August 9, 2013, approximately two-and-a-half years before the Settlement Agreement was executed. Compl. ¶ 26; Pl.'s Mem. at 19 (noting that the current action stems from Defendants "misconduct as Plaintiff's former accountants and financial advisors—prior to their wrongful repudiation of [that] relationship in 2013"). While the Release Clause expressly releases the counterparties "in their present or former capacities" it provides no similar temporal broadening with respect to the parties' agents, despite such language being common place in release clauses. *See, e.g., Redzepagic v. Hammer*, No. 14 CIV. 9808 (ER), 2017 WL 780809, at *2 (S.D.N.Y. Feb. 27, 2017) (concerning clause releasing "*past and present* members, officers, directors, partners, agents") (emphasis added); *Denenberg v. Mahler*, 335 F. Supp. 2d 362, 363 (E.D.N.Y. 2004) (concerning clause releasing "*past, present or future* directors, officers, agents or employees") (emphasis added).

Finally, under Florida law "courts may look to [the] subsequent action of the parties to determine the interpretation that they themselves placed on the contractual language." *Brown v. Fin. Serv. Corp., Int'l*, 489 F.2d 144, 151 (5th Cir. 1974) (citing *LaLow v. Codomo*, 101 So.2d 390 (Fla.1958)). Here, the subsequent conduct of the parties to the Settlement Agreement suggests that they did not intend to release Defendants. Pursuant to paragraph 20 of the Settlement Agreement, which provides for the "Execution of Necessary Documents," the parties entered into no less than six General and Mutual Releases to give "full force and effect to the provisions" of the Settlement Agreement. Settlement Agreement ¶ 20; Doc. 36 Ex. A. Most

notably, Plaintiff and Mr. Elias entered into a stand-alone general and mutual release, thereby bolstering her argument that the parties' intended to release only those individuals expressly covered by a general release executed pursuant to paragraph 20 to give "full force and effect to the" Settlement Agreement's Release Clause.  *See* Pl.'s Mem. at 3–7, 14.  Defendants urge the Court to draw little from this release, contending that it is unrelated to the dissolution of marriage action governed by the Settlement Agreement and that it was entered into pursuant to paragraph 23 in order to release the parties from claims related to a separate "'Civil Defamation Action' against plaintiff bearing . . . Case No. V502014CA010914XXXXMB."  Defs.' Mem. at 6.  But there is nothing in the separate general and mutual release between Plaintiff and Mr. Elias that bears the case number associated with the civil action, or otherwise references that defamation action; rather, it bears the case number associated with the Settlement Agreement and references that action only.  *See* Doc. 36 Ex. A.  Accordingly, the only reasonable inference to be drawn is that the parties understood that separate general and mutual releases would be needed to give "full force and effect" to the Settlement Agreement's Release Clause.  If such a release was necessary for the principal parties to the release agreement, *a fortiori*, a paragraph 20 release was necessary for Defendants.  Because Defendants are not covered by a stand-alone paragraph 20 release, it cannot be said that the parties to the Marital Settlement Agreement clearly expressed an intent to release Defendants in their capacity as Plaintiff's former agents.  *See Morgan Stanley DW Inc.*, 873 So.2d at 403 (Fla. 4th DCA 2004); *see also Alexander v. Kirkham*, 365 So. 2d 1038, 1040–41 (Fla. Dist. Ct. App. 1978) (finding defendants not covered by release clause where they were not "parties to the release agreement, gave [no] consideration for it, *[and did*

*not] change[] their position in any way in reliance upon its terms*") (emphasis added).[4]

## B. Breach of Contract

Defendants argue that Plaintiff cannot state a breach of contract claim because that claim is "entirely duplicative of the Complaint's negligence/accounting malpractice claim." Def's Mem. at 19. According to New York law, "a claim for breach of contract is properly dismissed as redundant . . . of a malpractice claim, where it does not rest upon a promise of a particular or assured result, but rather upon defendant's alleged breach of professional standards." *Diamond v. Sokol*, 468 F. Supp. 2d 626, 640 (S.D.N.Y. 2006) (alteration in original) (internal quotation marks omitted). Plaintiff alleges that Defendants violated the terms of their engagement with her by failing:

> (i) to maintain all client confidences and to take all steps necessary to safeguard confidential information and documents entrusted to them during the course of their professional engagement; (ii) to faithfully represent her interests in a non-conflicted manner in accordance with the stated objectives of the accounting profession; (iii) to make all reasonable efforts to avoid a conflict of interest and to communicate honestly and openly with respect to the foregoing.

Compl. ¶ 53. This language does not constitute a promise of a particular or assured result. Rather, this language is similar to language used to describe Plaintiff's malpractice claim, which

---

[4] Defendants argue the Settlement Agreement should be construed against Plaintiff because she jointly prepared and drafted the agreement along with Mr. Elias. Defs.' Mem. at 8–9. However, as Plaintiff notes, paragraph 32 of the Settlement Agreement, on which Defendants rely, makes clear that the agreement is to be "construed as being jointly prepared and written by all the parties hereto," Settlement Agreement ¶ 32, precisely so that no party would be deemed the draftsperson against whom all ambiguities would be resolved. *See* Pl.'s Mem. at 10; Settlement Agreement ¶ 32 ("The fact that one lawyer or the other prepared the actual final drafting shall not be construed as having been a document created by that attorney for purposes of having any ambiguities contained herein construed against that party."). In any event, however, the rule that Defendants invoke is "at best . . . a secondary rule of interpretation, a 'last resort.'" *The School Bd. Of Broward Cty v. The Great Am. Ins. Co.*, 807 So.2d 750, 752 (Fla. 4th DCA 2002) (quoting *Hurd v. Ill. Bell Tel. Co.*, 136 F. Supp. 125, 134 (N.D. Ill. 1955)); *see also Wash. Nat. Ins. Corp. v. Ruderman*, 117 So.3d 943, 957 (Fla. 2013) ("[C]ontract law . . . allows the use of extrinsic evidence to attempt to resolve an ambiguous insurance contract instead of simply construing it against the drafter.").

also alleges that Defendants "failed to maintain the confidentiality" of her information, disregarded her best interests, and "failed to identify and disclose potential and actual conflicts of interest." *Id.* ¶ 35. As in MF Global *Holdings Ltd. V. PricewaterhouseCoopers LLP*, the contractual obligations Defendants allegedly violated "are no different from the duties encompassed in [her] malpractice claim." 43 F. Supp. 3d 309, 316 (S.D.N.Y. 2014). Therefore, the Court concludes that the breach of contract claim is duplicative of the malpractice claim and grants Defendants' motion to dismiss with respect to Plaintiff's third cause of action.

**C. Fiduciary Duty**

Next, Defendants argue that Plaintiff's claim for breach of fiduciary duty must be dismissed because the parties were only engaged in a conventional accountant-client relationship and that no special circumstances exist to warrant imposing a fiduciary obligation on Defendants. Def's Mem. at 20. The Court disagrees.

"[C]ourts 'do not generally regard the accountant-client relationship as a fiduciary one.'" *Block v. Razorfish, Inc.*, 121 F. Supp. 2d 401, 403 (S.D.N.Y. 2000) (quoting *Nate B. & Frances Spingold Foundation v. Wallin, Simon, Black and Co.*, 184 A.D.2d 464 (1st Dept. 1992)); *accord Fund of Funds, Ltd. V. Arthur Andersen & Co.*, 545 F. Supp. 1314, 1356 (S.D.N.Y. 1982). Nonetheless, New York courts will permit a breach of fiduciary duty claim against an accountant under "special circumstances." *AHA Sales, Inc. v. Creative Bath Prod., Inc.*, 58 A.D.3d 6, 21–22 (2008) (quoting *L. Magarian & Co. v. Timberland Co.*, 245 A.D.2d 69, 70 (1997). Special circumstances may be found "where the allegations include knowledge and concealment of illegal acts and diversions of funds and failure to withdraw in the face of a conflict of interest." *Nate B. & Frances Spingold Foundation v. Wallin, Simon, Black & Co.*, 184 A.D.2d 464, 465– 66 (N.Y. App. Div. 1992) ("*Nate B*"), *superseded by statute on other grounds*, CPLR § 214, *as*

*recognized in Chase Scientific Research, Inc. v. NIA Grp, Inc.*, 268 A.D.2d 115 (N.Y. App. Div. 2000)); *accord Malmsteen v. Berdon, LLP*, 477 F. Supp. 2d 655, 662 (S.D.N.Y. 2007); *see Block*, 121 F. Supp. 2d at 403 (recognizing that "where the accountant engages in affirmative fraud on the client," a claim for breach of fiduciary duty may stand).

Here, Elias alleges that over the course of their thirteen-year long relationship she placed "great trust and faith in Heppen as her financial adviser and accountant, and relied upon him to handle virtually all of her financial affairs without her direct involvement or oversight." Compl. ¶¶ 10, 48. In 2002, in preparation for Plaintiff's marriage to Mr. Elias, Heppen assisted Plaintiff in drafting the prenuptial agreement that would govern the dissolution of that marriage. *Id.* ¶ 10. Notwithstanding that work, Plaintiff alleges that Defendants self-interestedly encouraged Mr. Elias to breach the terms of the prenuptial agreement by diverting approximately $4.5 million of Plaintiff's funds to a different account so that Mr. Elias—who had significantly fewer assets—would be able to pay Defendants to represent his interests in the divorce proceedings. Compl. ¶¶ 19, 26, 62. Plaintiff further alleges that Defendants failed to timely withdraw as her accountants notwithstanding a clear conflict of interest, and that Defendants failed to notify her that they would be working on behalf of Mr. Elias in the divorce proceedings. Given the parties' course of conduct, the alleged "diversion[] of funds" for Defendants' benefit, and Defendants' "failure to withdraw in the face of a conflict of interest," *Nate B.*, 184 A.D.2d at 465–66, Plaintiff's "breach of fiduciary duty cause of action . . . will be permitted to stand," *Malmsteen*, 477 F. Supp. 2d at 662.

### D. Gross Negligence

Defendants argue that the Court must dismiss Plaintiff's claim for gross negligence because their actions neither belie a reckless disregard for Plaintiff's rights nor rise to the level of

intentional wrongdoing.  Def's Mem. at 22.  In New York, "[g]ross negligence is 'conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing.'"  *Am. Tel. & Tel. Co. v. City of N. Y.*, 83 F.3d 549, 556 (2d Cir. 1996) (quoting *Colnaghi, U.S.A., Ltd. V. Jewelers Protection Servs.*, *Ltd.,* 611 N.E.2d 282, 284 (1993)).  The relevant inquiry, then, is whether Defendants' "errors, mistakes, or omissions constituted a gross failure to exercise due care."  *Id.*

Plaintiff's allegation that Defendants encouraged her former husband to divert certain funds from her accounts, in violation of the couples' prenuptial agreement, in order to pay for Defendants' services in the divorce proceeding is sufficient to support a claim of gross negligence at the motion to dismiss stage.  This is particularly so where, as here, Defendants assisted in the drafting of the very prenuptial they are alleged to have induced Mr. Elias to violate.  The Court therefore denies Defendants' motion to dismiss the gross negligence claim.

### E.  Conflict of Interest

Finally, without any support from the record, Defendants argue that Elias' conflict of interest cause of action must be dismissed because she has not shown "causation and damages."  Def's Mem. at 23.  It is well settled that even if a conflict of interest violates the Code of Professional Responsibility, "it does not by itself support a legal malpractice cause of action," *Sumo Container Station, Inc., v. Evans, Orr, Pacelli, Norton & Laffan, P.C.*, 278 A.D.2d 169, 170 (N.Y. App. Div. 2000), and that a plaintiff "must still establish that such a conflict caused an actual injury," *Stonewell Corp. v. Conestoga Title Ins. Co.*, 678 F. Supp. 2d 203, 211 (S.D.N.Y. 2010).  Elias has plead sufficient facts to establish that Defendants' conduct proximately caused her harm.  She alleges not only that Defendants encouraged Mr. Elias to take actions in violation of his prenuptial agreement, but that Defendants also shared her confidential, financial

information with Mr. Elias in order to advance his interests in the divorce proceedings. Likewise, she contends that as a result of Defendant's actions she has been damaged by the wrongful misappropriation of approximately $4.5 million, in addition to legal fees and costs she incurred to defend her interests in the divorce proceedings (including vindicating her rights contained in the prenuptial agreement). Such allegations are more than sufficient to support the causation and damages elements of Plaintiff's conflict of interest claim. Accordingly, the Court denies Defendant's motion to dismiss this claim.

## IV. CONCLUSION

For the reasons set forth above, the Defendants' motion to dismiss Plaintiff's Complaint is GRANTED with respect to the breach of contract claim, and DENIED in all other respects.

The Clerk of the Court is respectfully directed to terminate the motion, Doc. 28.

SO ORDERED.

Dated: June 25, 2018
New York, New York

                                                             Edgardo Ramos, U.S.D.J.